O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY LOWE, | ) Case No. CV 10-02795-JVS (KES) |
| Petitioner, | ) |
| | ) |
| vs. | ) FINAL REPORT AND |
| | ) RECOMMENDATION OF UNITED |
| MARY LATTIMORE (Warden), | ) STATES MAGISTRATE JUDGE |
| Respondent. | ) |
| | ) |

This Report and Recommendation is submitted to the Honorable James V. Selna, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEDURAL HISTORY

**A.     Proceedings Before Filing of Federal Habeas Petition**

On December 27, 2007, Petitioner Ashley Lowe ("Petitioner") pled guilty to second degree murder pursuant to a plea agreement and was sentenced to a term of 16 years to life. (DE #6 at 1.) Petitioner did not file a direct appeal. (Id.) Thus, her conviction became final 60 days after her sentencing – on February 25, 2008. (Id. at 3.) Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), Petitioner had one year from February 25, 2008, in which to file her federal habeas petition. (Id.)

1

Rather than immediately file in federal court, Petition first sought habeas review in state court. Petitioner filed her first state habeas petition with the Los Angeles Superior Court on October 2, 2008, which left 145 days in the one-year AEDPA limitations period. (Id. at 2-3.) The first state petition was denied on October 15, 2008. Petitioner filed her second state habeas petition with the California Court of Appeal on November 17, 2008. (Id. at 2.) The second state petition was denied on December 11, 2008. (Id.) Petitioner filed her third state habeas petition with the California Supreme Court on January 29, 2009. (Id.) The third state petition was denied on July 8, 2009. (Id.) Pursuant to 28 U.S.C. § 2244(d)(2), Petitioner received the benefit of statutory tolling for the time period during which her first round of habeas petitions was pending in the state courts and the gaps in between those petitions, from October 2, 2008, until the California Supreme Court denied her final petition on July 8, 2009.[1] (Id. at 3-4.) Thus, Petitioner had until 145 days after this date – November 30, 2009 – to file her federal habeas petition. Petitioner ultimately filed her federal petition on April 6, 2010 – 127 days after the AEDPA limitations period had ended.[2] (Id. at 4.)

Petitioner's federal petition, (DE #1), was dismissed with leave to amend on April 21, 2010. (DE #3.) Petitioner filed a First Amended Petition ("FAP") on May

[1]     These uncontroverted dates are set out in the magistrate judge's May 19, 2010, report and recommendation that Petitioner's federal petition be dismissed as untimely, as discussed below. (DE #6.) However, there appears to be a typo in the R & R, which states that Petitioner was entitled to statutory tolling from October 2, *2009*, to July 8, 2009. (See id. at 4.) Indeed, the sentence immediately proceeding this statement in the R & R cites the correct starting date – October 2, 2008. (Id.)

[2]     The May 19, 2010, R & R slightly misstates Petitioner's filing date. Petitioner actually signed and dated the petition on April 8, 2010. (DE #1 at 7.) It was Petitioner's accompanying IFP form that was signed and dated on April 6, 2010. (Id. at 9.) For consistency's sake, and because the two-day difference is not material here, the Court recites the federal filing date as stated in the 2010 R & R.

2

13, 2010.  (DE #4.)  As with her state habeas petitions, Petitioner claimed that she was entitled to relief because her rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), were violated during the interrogation process and because counsel was ineffective in failing to explain fully the plea agreement to Petitioner prior to her guilty plea.  (<u>Id.</u> at 5-8.)

**B.    Proceedings After Filing of Federal Habeas Petition**

      **1.    The Courts First Debate Equitable Tolling.**

      Without reaching the merits of the FAP's two claims, the magistrate judge recommended the FAP be dismissed as untimely, noting that equitable tolling was not available to Petitioner on the record before the court at that time.  (DE #6 at 4.) Petitioner filed objections to the report and recommendation and set out additional grounds for equitable tolling, alleging that her petition was untimely due to an inadequate law library that did not provide materials regarding AEDPA's rules.  (DE #7 at 1.)  Petitioner also noted that inmates were restricted to one hour of library time per week, and that these already limited sessions were frequently cancelled altogether due to "medical emergencies, fights, lock downs, staff training and California budget cuts."  (<u>Id.</u>)  Lastly, Petitioner noted she was only 15 years old at the time of her arrest, and her resulting limited education had also hindered her ability to timely file her petition.  (<u>Id.</u> at 1-2.)  After reviewing the magistrate judge's report and recommendation, as well as conducting a *de novo* review of those portions of the R & R to which objections had been filed, the District Court accepted and adopted the findings and recommendations, dismissing the petition with prejudice on June 30, 2010.  (DE #10.)

      Petitioner appealed the District Court's dismissal order.  (DE #13.)  The Ninth Circuit Court of Appeals appointed counsel for Petitioner, (DE #16) and ultimately reversed the District Court's dismissal order on September 23, 2014.  (DE #28.)  In an unpublished opinion, the Ninth Circuit held that the District Court abused its discretion when it failed to address the equitable tolling claims Petitioner had raised

in her objections to the magistrate judge's R & R. (Id. at 4.) Nevertheless, while concluding that "[t]he district court erred in failing to address each of [Petitioner's] arguments for equitable tolling – not just the potentially meritorious ones[,]" the Ninth Circuit did caution that it has "not recognized a petitioner's limited education or routine limits on access to a prison law library as sufficiently extraordinary circumstances to warrant equitable tolling." (Id. at 5 n.4.)[3]

Upon remand, Petitioner requested a briefing schedule as to whether her habeas petition was timely filed due to equitable tolling. (DE #31.) In response, the newly-assigned magistrate judge issued a minute order directing Petitioner to file a sworn declaration providing the following information: (1) a specific description of the "few and inadequate resources in the prison law library" that existed from October 3, 2009, and ending on April 6, 2010[4] ("Relevant Period"); (2) if the few and inadequate resources did include AEDPA materials, Petitioner must identify the specific AEDPA materials that were available; (3) the number of times that she had access to the prison library during the Relevant Period; (4) whether the prison librarian, librarian assistant,

---

[3]    On appeal, Petitioner cited several additional factors supporting her equitable tolling claim. According to Petitioner, the following circumstances prevented her from timely filing her federal habeas petition: Petitioner has an IQ of 62 and has been diagnosed with mild mental retardation; these intellectual limitations rendered her completely unable to file a habeas petition on her own; a fellow inmate who had managed all of Petitioner's state habeas filings misadvised Petitioner as to the correct federal filing deadline; Petitioner's father told her not to file the petition because he was getting her a lawyer (which never happened); and the Superior Court judge who took Petitioner's guilty plea refused to provide copies of the plea agreement, sentencing minute order and abstract of judgment, which delayed the filing of the petition. (DE #31 at 3.)

[4]    It appears that the new magistrate judge incorrectly used October 3, 2009, as the starting point of Petitioner's state habeas filing period. As discussed above in Note 1, the correct start date is October 2, 2008. Also, per Note 2, Petitioner actually filed her federal petition on April 8, 2010, not April 6, 2010.

1    or any inmate was available to assist, or did assist, Petitioner in preparing her 2254
2    petition during the Relevant Period and, if so, when Petitioner sought the assistance;
3    and (5) any other specific factual information that would show Petitioner is entitled
4    to equitable tolling for the entire Relevant Period because there were "few and
5    inadequate resources in the prison law library." (DE #35 at 1.) On January 23, 2015,
6    Petitioner filed her own declaration complying with the court's directive, as well as
7    a declaration from the inmate who had admittedly misadvised Petitioner as to the
8    federal filing deadline.  (DE #39.)

9                **2.      The Debate Turns to the Merits of the Petition.**

10             The case was then transferred to its third magistrate judge.  The Court reviewed
11   the earlier filings and determined that "it would be in the interests of judicial economy
12   to first consider the merits of [P]etitioner's two claims under the governing AEDPA
13   standard of review[.]" (DE #42 at 1.)  Rather than resolve the equitable tolling debate,
14   the Court concluded that it would be more efficient to address the merits, because it
15   appeared that (a) Petitioner's Miranda claim was barred by Tollett v. Henderson, 411
16   U.S. 258, 266-67 (1973) ("When a criminal defendant has solemnly admitted in open
17   court that he is in fact guilty of the offense with which he is charged, he may not
18   thereafter raise independent claims relating to the deprivation of constitutional rights
19   that occurred prior to the entry of the guilty plea"); and (b) Petitioner likely would not
20   be able to sustain her AEDPA burden with respect to her ineffective assistance claim.
21   (Id. at 1-2.)  Accordingly, the Court ordered that Respondent file an Answer to the
22   FAP, instructing that the time bar issue did not need to be briefed.  (Id.)  On May 15,
23   2015, Respondent filed an Answer.  (DE #47.) Petitioner filed a Reply on August 12,
24   2015.  (DE #57.)  Thus, this matter now is ready for a decision on the merits.
25   //
26   //
27   //
28

5

## DISCUSSION

**A.   Summary of Petitioner's Two Claims**

   **1.   _Miranda_ Claim**

      **a.   Petitioner's Interview with Detectives**

In her first claim, Petitioner alleges that her <u>Miranda</u> / 6th Amendment rights were violated during the interrogation process prior to her arrest.  (DE #4 at 5.)

According to Petitioner, she arrived at the police station and was placed in an interrogation room.  (<u>Id.</u>)  A homicide detective came into the room, introduced himself, and told Petitioner she was a suspect in a murder case.[5]  (<u>Id.</u> at 5-6.)  The detective then asked Petitioner where she was on the day of the murder.  Petitioner initially told the detective that she had entered a store, came out, heard gunshots, and ran. (<u>Id.</u> at 6.)  The detective called Petitioner a liar and said, "Let's start over."  That is when Petitioner told the detective that she and a friend planned on robbing two boys who were standing on the corner. (<u>Id.</u>) According to Petitioner, she told the detective "the whole scenario from beginning to end."  (<u>Id.</u>)  Only then did the detective read Petitioner her <u>Miranda</u> rights.  (<u>Id.</u>)  The detective should have read Petitioner her <u>Miranda</u> rights when he informed Petitioner she was a suspect in the homicide case and said he needed to ask her some questions.  (<u>Id.</u>) Petitioner was not told she had the right to an attorney before questioning began.  (<u>Id.</u>)  Furthermore, Petitioner's grandmother, who served as her legal guardian, was not told that Petitioner was a suspect in a homicide case.  (<u>Id.</u>)  After the interrogation, the detective placed Petitioner under arrest for robbery.  (<u>Id.</u>)  Petitioner was then transported to juvenile hall, where she was told she was being held for both murder and robbery.  Petitioner spent seven days at the juvenile detention center before being released pending trial. (<u>Id.</u> at 6-7.)

---

    [5]     As discussed below, a transcript of Petitioner's interview with police reveals that this did not happen.  (<u>See</u> ER 121-165.)

The transcript of the interview sheds light on Petitioner's first claim.[6]

Before the interview began, the homicide detective conducting the interview confirmed that Petitioner was 15 years old and that she had voluntarily agreed to come down to the station. The detective expressly informed Petitioner that she was not under arrest and free to leave at any time.[7] (ER 122-123.) Petitioner's grandmother had been told this as well. (ER 123.) Petitioner admitted she was present during the shooting, which had taken place three days earlier at the intersection of 110th and Vermont in Los Angeles. (ER 123.) In Petitioner's first account, Petitioner said she had walked to a corner market near the intersection when she saw a friend and gang

---

[6]   The transcript of Petitioner's videotaped interview can be found in the Excerpts of Record that Petitioner filed when appealing the District Court's dismissal order to the Ninth Circuit. The lodged Excerpts will be designated by "ER [page number]" when cited. The interview transcript is at ER 121-165, while a short summary of Petitioner's statements can be found at ER 42-44.

[7]   Such advisements weigh strongly in favor of the view that an interviewee was not in custody. California v. Beheler, 463 U.S. 1121, 1122 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977); United States v. Crawford, 372 F.3d 1048, 1059-60 (9th Cir. 2004) (en banc); cf. Smith v. Clark, 612 Fed.Appx. 418 (9th Cir. 2015), reh'g denied en banc, – F.3d – (9th Cir. Oct. 22, 2015). Furthermore, Petitioner was believed to be a witness at this point, not a suspect. (ER 172, 174, 205.) The detective who interviewed Petitioner had also interviewed a gang member nicknamed "Snap" earlier that day. "Snap" told the detective that he had witnessed the murder. (ER 40.) He said he saw a gang member nicknamed "Lucky" riding a bicycle near the intersection where the murder had taken place. A girl he knew as "Lowkey" was on the back of the bike. "Snap" said he and "Lowkey" went into a nearby market. When he came out of the market, he saw "Lucky" shoot two men who had been standing on the street corner. "Lucky" then rode his bike away from the scene and "Lowkey" ran away. "Snap" said he did not know the true names of either "Lucky" or "Lowkey" and was released pending further investigation. The detective then contacted deputies to see if they knew a "Lowkey." The deputies said they did know "Lowkey" (Petitioner) and had contacted her in the general area the night after the murder. At that time, Petitioner told the deputies she knew nothing about the murder, but then said an unnamed gang member had committed the crime. (ER 41.)

member nicknamed "Snap" on the corner.  She went into the market and when she came out, she saw "Snap" speaking with two young men.  The two men asked to buy marijuana from "Snap" and began to walk across the street to get money for the drugs. According to Petitioner, "Snap" simply started shooting at the two men as they crossed the street. (ER 123-128.)

Petitioner then expanded upon her story, telling the detective that "Snap" had given her a ride on the back of his bicycle on the way to the market and that she had briefly spoken with the two young men as well.  (ER 133, 138-139.)  Petitioner admitted she thought "Snap" might have had a gun with him and said "Snap" planned on asking the two men where they were from (*i.e.* what gang they were with) and on fighting the two men if they gave the wrong answer. (ER 143-144.)  Both men told "Snap" that they did not belong to a gang. (ER 145.) Petitioner said she went into the market for a few minutes and, when she came out, "Snap" was angrily confronting one of the men. (ER 146-147.)  Petitioner then admitted she saw that one of the men had cash on him when she first arrived at the market. (ER 148-149.)  Petitioner now said that "Snap" and the two young men discussed the marijuana sale before she went into the store.  One of the young men pulled out a $20 bill, although, according to Petitioner, no one had discussed how much the marijuana would cost, and the other man said he would go home to get money for the drugs. (ER 149.)

The detective became frustrated with Petitioner, telling her this sounded more like a robbery, and that he was "getting a little tired of [her] lies."  (ER 150.) Petitioner now said that she and "Snap" rode to the corner market on his bicycle and spotted the two young men as they stood nearby. (ER 152-153.)  "Snap" asked where they were from and they said nowhere.  Petitioner asked the two men if they were lying and they denied it.  "Snap" said he thought the men were lying and reached for what looked like a gun. (ER 153.) Petitioner said "Snap" demanded money from the two, which led to one of the men taking out the $20 bill and the other saying he had to go home to get money. (ER 154-155.)  Petitioner said she went into the market

8

shortly after this.  (ER 154.) The detective once again asked Petitioner to tell him the truth because it sounded like "Snap" was in the process of robbing the two men – and that he did so while Petitioner was standing right next to him. (ER 155.)  At this point, Petitioner told the detective: "To be honest with you, we was going to jack [rob] them."  (ER 156.)  Petitioner said she went into the store, bought a couple of items, and then agreed with "Snap" that they should rob the two men who were standing outside.  Petitioner said she suggested the idea to "Snap" after seeing he had a gun on him during their bike ride to the market.  (ER 157-158.)

The detective then informed Petitioner of her <u>Miranda</u> rights, telling Petitioner she had the right to remain silent, that anything she said could be used against her in court, and that she had the right to an attorney before they talked, meaning "you can have a lawyer here if you want." (ER 158.)  The detective – who purposefully chose not to read the warnings from a pre-printed card (ER 208) – failed to tell Petitioner that if she could not afford an attorney, one would be appointed for her and that if she did decide to talk to them without a lawyer present, she would still have the right to cease answering questions at any time until speaking with an attorney.[8]

After this <u>Miranda</u> warning, Petitioner further described the robbery plan.  After Petitioner and "Snap" left the corner market, Petitioner told "Snap" that they should rob the two young men standing nearby.  "Snap" agreed. (ER 159.)  When asked, "Who put the plan together, you or him?" Petitioner responded, "We both did." Petitioner suggested to "Snap" that – after setting up a bogus marijuana sale – they

_____

[8]      A thorough <u>Miranda</u> warning typically contains the following admonitions: You have the right to remain silent. Anything you say or do may be used against you in a court of law. You have the right to consult an attorney before speaking to police and to have an attorney present during questioning now or in the future. If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  If you decide to answer any questions now, without an attorney present, you will still have the right to stop answering at any time until you talk to an attorney.  <u>See</u> <u>Florida v. Powell</u>, 559 U.S. 50, 59-60 (2010).

should tell the two men to go down a nearby alley so they could get them off the street and rob them without any witnesses. According to Petitioner, that was when "Snap" said he was going to pull a gun on the two men. (ER 159-160.) Their attempt to lure the two men into the alley failed, however, and the two men began to cross the street instead. "Snap" then pulled out the gun, pointed it, aimed it, and shot. (ER 160.) "Snap" fired five times, killing one of the men. He did not stop to take any money out of the victims' pockets, instead riding back down the street on his bicycle. Petitioner ran alongside "Snap" but the two eventually split up. (ER 160-161.) Petitioner ran to her grandmother's home, who lived nearby, and told detectives she had not seen "Snap" since the murder.[9] (ER 162.)

The detective informed Petitioner of her <u>Miranda</u> rights one more time – once again, failing to tell Petitioner that if she could not afford an attorney, one would be appointed for her and that if she did decide to speak without a lawyer present, she would still have the right to stop answering questions at any time until she spoke with an attorney – and told Petitioner he had a few additional questions. Petitioner said she no longer wanted to speak with detectives. The interview then ended. (ER 165.)

### b.   Subsequent Suppression Motions

Petitioner's defense attorney moved to suppress Petitioner's statements, arguing they were not made voluntarily; that detectives should have administered <u>Miranda</u> warnings at the beginning of the interview; and that the warnings eventually administered were faulty. (ER 168, 225, 243-249.) The state trial court found that the interview was not custodial in nature initially. Petitioner was not considered a suspect when first brought to the station, and Petitioner confirmed to detectives that she was there freely and voluntarily. (ER 252.) Consequently, the initial portion of the interview did not require a <u>Miranda</u> advisal and the statements Petitioner made before

---

[9]   When re-interviewed and confronted with Petitioner's statements later that same day, "Snap" ultimately confessed to shooting both men. (ER 44-45.)

1    the advisal were deemed voluntary and admissible. (ER 253.)

2        As the court observed, however, a tonal shift occurred during the interview

3    when it became clear that the detective believed Petitioner was actually involved in

4    the murder, rather than a mere witness. (ER 253.) Indeed, this was why the detective

5    administered <u>Miranda</u> warnings, although, as the court noted, he failed to ask

6    Petitioner if she understood her rights or whether she expressly waived them. (ER

7    254.) Furthermore, the warnings contained a "fatal defect" – although the detective

8    told Petitioner she had the right to counsel, he failed to advise her that one would be

9    provided free of charge if she so desired. (ER 254.) Thus, the court suppressed the

10   statements Petitioner made after <u>Miranda</u> warnings were administered.[10] (ER 255.)

11       Once Petitioner's case was transferred from juvenile to adult court, Petitioner's

12   new attorney moved to suppress her statements once again. (ER 277.) This time,

13   counsel had Petitioner examined by a psychologist, who testified at great length

14   during the hearing and opined that Petitioner's documented intellectual limitations

15   prevented her from understanding her <u>Miranda</u> rights, specifically the right to ask for

16   an attorney and the right to end the interview at any time. (ER 283, 288-289, 323.)

17   Nevertheless, after listening to the testimony and watching the videotaped interview,

18   the new trial court found that the police did not take advantage of Petitioner's low IQ

19   and did not use any "coercive tactics against her, either physically or psychologically,

20   to get her to talk." (ER 327.) Thus, the court determined that Petitioner's <u>Miranda</u>

21   waiver was "knowing, free and voluntary" as were her statements to the police. (<u>Id.</u>)

22

23

24       _____

25       [10]    By the time the defective warnings were administered, Petitioner had
     already revealed that she and "Snap" planned on robbing the two men. (ER 156.)
26   Petitioner said she went into the store, bought a couple of items, and then agreed with
     "Snap" that they should rob the two men standing nearby. Petitioner said she
27   suggested the idea to "Snap" after noticing that he had a gun on him during their bike
     ride to the market. (ER 157-158.)
28

With that, the court denied the suppression motion.[11] (Id.)  Directly after the court's ruling,  Petitioner pled no contest  to second degree murder pursuant to the parties' negotiated plea agreement.  (Id.)  All other counts and enhancements were dismissed as a result of the plea.  (ER 327-328.)  As agreed to by the parties, Petitioner was immediately sentenced to a term of 16 years to life in state prison.  (ER 336.)

### c.   State Habeas Review of Petitioner's <u>Miranda</u> Claim

The Los Angeles Superior Court denied Petitioner's first state habeas petition on October 15, 2008.  (DE #4 at 12.)  In the accompanying minute order, the court disposed of Petitioner's <u>Miranda</u> claim with the following sentence: "In Ground #1, [Petitioner] raises a <u>Miranda</u> violation. That is not a proper issue for habeas corpus." (Id.)  Both the California Court of Appeal and California Supreme Court denied the petition without comment or citation to authority.  (Id. at 14-15.)

### 2.   Ineffective Assistance of Counsel Claim

### a.   Petitioner's Plea Colloquy

In her second claim, Petitioner alleges that her attorney provided ineffective assistance of counsel ("IAC") during the plea process.  (DE #4 at 5.)

According to Petitioner, she was offered – and rejected – a plea deal of  22 years at 85% (or approximately 18 years and 7 months).  Petitioner was then offered

---

[11]      It appears the court refused to suppress either Petitioner's pre-<u>Miranda</u> or post-<u>Miranda</u> statements.  (Id.) The court could do so, because it was not bound by the previous court's ruling. <u>See</u> <u>People v. Mattson</u>, 50 Cal.3d 826, 851-52 (1990).  By now, two defense attorneys had tried to get Petitioner's statements suppressed on four separate grounds, arguing that Petitioner's interview was custodial from the start, thus triggering the need for <u>Miranda</u> warnings; that the warnings which were eventually administered were defective; that Petitioner's limited intellectual abilities prevented her from understanding her <u>Miranda</u> rights; and that Petitioner's statements were not made voluntarily.

a term of 16 years to life.[12]  (Id. at 8.) Petitioner claims her attorney explained this second offer to her grandmother, who was present in the courtroom, and asked her to convince Petitioner to sign the plea agreement.  (Id.)  After speaking with Petitioner's grandmother, Petitioner's attorney then "returned in front of the judge and explained to him that he couldn't be the one to tell [Petitioner] about the plea."  (Id.)  The attorney said he was going to have Petitioner's grandmother explain the plea agreement to Petitioner in order to resolve the case.[13]  (Id.)  According to Petitioner, her grandmother then pulled up a seat and began to explain the plea agreement, telling Petitioner she had been offered 16 years to life and that if she rejected the offer, she faced 110 years to life.  (Id.)  "So I signed," Petitioner stated. "My attorney never explained any parts of my plea to me. Just showed me where I needed to initial and sign. The whole thing was never explained to me by a legal professional."  (Id.)

A transcript of the plea colloquy contradicts Petitioner's claims.[14]

During the hearing, Petitioner confirmed that she was entering the agreement freely and voluntarily because she thought it was in her best interest to do so.  (ER 328.)  Petitioner expressly gave up her right to a trial, to confront and cross-examine witnesses, to call her own witnesses to testify on her behalf, and her right against self-incrimination.  (Id. at 330-331.)  Notably, Petitioner also explicitly waived her appellate rights.  Absent this waiver, Petitioner would have had the right to appeal

---

[12]    It is unclear when the first offer was made. It appears that the second offer was extended after the prosecution prevailed at Petitioner's second suppression hearing. (ER 327.)

[13]    Petitioner's attorney did not make this statement.  Instead, he told the court that both he and Petitioner's grandmother had a "lengthy conversation" with Petitioner about the case prior to her plea. (ER 328.)

[14]    The transcript is at ER 327-338. The plea agreement is at ER 372-375.

1   both her plea and the court's denial of her suppression motion.[15] (Id. at 333.)

2   Petitioner confirmed that no one had promised her anything or threatened her in order

3   to get her to plead. (Id.) Petitioner's initialed and signed plea agreement reflected the

4   same. (Id. at 372-373.) The plea agreement also confirmed that Petitioner was

5   pleading guilty in order to take advantage of a plea bargain. (Id. at 373.) Petitioner's

6   counsel joined in the waivers, concurred in the plea, and stipulated to a factual basis

7   for it. (Id. at 335, 373.) The court found that Petitioner's plea was "knowing, free,

8   intelligent and voluntary" and that Petitioner had demonstrated an understanding of

9   the consequences of her plea. (Id. at 336.) Accordingly, the court accepted

10  Petitioner's plea. (Id.)

11              **b.     State Habeas Review of Petitioner's IAC Claim**

12          The Los Angeles Superior Court denied Petitioner's first state habeas petition

13  on October 15, 2008. (DE #4 at 12.) In the accompanying minute order, the court

14  disposed of Petitioner's IAC claim as follows: "[Petitioner] claims in Ground #2 that

15  her lawyer was ineffective because he did not explain the plea agreement with her and

16  did not discuss her constitutional rights with her. A review of the transcript of the

17  plea and the written plea form, signed by [Petitioner], contradicts [Petitioner's]

18  contentions that her lawyer did not discuss the case and her rights with her." (Id.)

19  Both the California Court of Appeal and California Supreme Court denied the petition

20  without comment or citation to authority. (Id. at 14-15.)

21  //

22  //

23  //

24

25          [15]     While the court told Petitioner she was waiving her right to appeal the

26  plea as well as the suppression ruling, the court did not specify whether Petitioner was

27  also waiving her right to collaterally attack the plea or ruling in a habeas proceeding.
    As discussed below in Section B.2, Petitioner is not entitled to relief regardless of

28  whether her waiver encompassed habeas proceedings.

**B.    Analysis of Petitioner's Two Claims**

Petitioner must show that her attorney provided ineffective assistance of counsel at the time of her guilty plea in order to prevail on *either* claim. Because the underpinning of both claims is identical and resolving Petitioner's IAC claim necessarily resolves her <u>Miranda</u> claim, the Court will address the IAC claim first.

**1.    Habeas Relief is not Warranted on Petitioner's IAC Claim.**

**a.    Petitioner Did Not Waive her IAC Claim.**

At the outset, the Court notes that Petitioner's appellate waiver does not bar her subsequent IAC claim. California courts – following the lead of federal courts – have now held that a criminal defendant cannot waive the right to bring a claim for ineffective assistance of counsel in which the defendant alleges ineffectiveness at the time he or she was entering the plea. <u>See</u> <u>People v. Orozco</u>, 180 Cal.App.4th 1279, 1285 (2010). "Ineffective assistance of counsel at those critical times would require a finding that the plea was not entered knowingly and voluntarily, which would in turn mean that a court could not enforce a waiver contained within that plea agreement." <u>Id.</u> (citation omitted). In short, "the waiver involved in this case is an express waiver of a statutory right of appeal, not an implicit waiver of the constitutional right to effective counsel." <u>People v. Vargas</u>, 13 Cal.App.4th 1653, 1659 (1993). <u>See also</u> <u>Washington v. Lampert</u>, 422 F.3d 864, 871 (9th Cir.2005); <u>United States v. Pruitt</u>, 32 F.3d 431, 433 (9th Cir.1994) (doubting whether "a plea agreement could waive a claim of ineffective assistance of counsel based on counsel's erroneously unprofessional inducement of the defendant to plead guilty or accept a particular plea bargain").

**b.    IAC Claims are Subject to a Stringent Standard of Review.**

Under the AEDPA, federal courts may grant habeas relief to a state prisoner on a claim that was adjudicated on the merits in a state court proceeding only if that adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the U.S.

15

1   Supreme Court; or (2) was based on an unreasonable determination of the facts in
2   light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).
3   The Los Angeles Superior Court's denial order constitutes the relevant state court
4   decision here. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

5       AEDPA presents "a formidable barrier to federal habeas relief for prisoners
6   whose claims have been adjudicated in state court." Burt v. Titlow, 134 S.Ct. 10, 16
7   (2013). The federal statute presents "a difficult to meet ... and highly deferential
8   standard for evaluating state court rulings, which demands that state court decisions
9   be given the benefit of the doubt." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011)
10  (internal citation and quotation marks omitted). On habeas review, AEDPA places on
11  petitioners the burden to show that the state court's decision "was so lacking in
12  justification that there was an error well understood and comprehended in existing law
13  beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S.
14  86, 103 (2011).  In other words, a state court determination that a claim lacks merit
15  "precludes federal habeas relief so long as fairminded jurists could disagree" on the
16  correctness of that ruling. Id. at 101.  Federal habeas review therefore serves as "a
17  guard against extreme malfunctions in the state criminal justice systems, not a
18  substitute for ordinary error correction through appeal." Id. at 102-103 (internal
19  citation and quotation marks omitted).

20      The burden imposed by AEDPA is especially heavy when a petitioner alleges
21  he or she received ineffective assistance of counsel. The general parameters of
22  Strickland v. Washington, 466 U.S. 668 (1984), are well known.  To have been
23  entitled to relief by the state court, Petitioner had to show both that her counsel
24  provided deficient assistance and that there was prejudice as a result. See Richter, 562
25  U.S. at 104.  In order to satisfy the "prejudice" requirement in the context of a guilty
26  plea, Petitioner had to show there was a reasonable probability that, but for counsel's
27  errors, she would not have pleaded guilty and would have insisted on going to trial.
28  See Hill v. Lockhart, 474 U.S. 52, 58 (1985).

1    However, on habeas review, "[t]he pivotal question is whether the state court's

2    application of the <u>Strickland</u> standard was unreasonable. This is different from asking

3    whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Richter,</u>

4    562 U.S. at 101. "Under AEDPA ... it is a necessary premise that the two questions

5    are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal

6    law is different from an *incorrect* application of federal law. A state court must be

7    granted a deference and latitude that are not in operation when the case involves

8    review under the <u>Strickland</u> standard itself." <u>Id.</u> (internal citation and quotation marks

9    omitted) (emphasis in original). <u>See</u> <u>id.</u> at 105 ("Federal habeas courts must guard

10   against the danger of equating unreasonableness under <u>Strickland</u> with

11   unreasonableness under § 2254(d). When § 2254(d) applies, the question is not

12   whether counsel's actions were reasonable. The question is whether there is any

13   reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard").

### c.    Relevant State Court Proceedings

15       As noted above, the Superior Court disposed of Petitioner's IAC claim by

16   reasoning: "[Petitioner] claims ... that her lawyer was ineffective because he did not

17   explain the plea agreement with her and did not discuss her constitutional rights with

18   her. A review of the transcript of the plea and the written plea form, signed by

19   [Petitioner], contradicts [Petitioner's] contentions that her lawyer did not discuss the

20   case and her rights with her." (DE #4 at 12.) Although the court cited no case law

21   when rejecting Petitioner's IAC claim, it was not required to do so. A state court

22   decision is contrary to clearly established federal law if it applies a rule that

23   contradicts the governing law set forth in U.S. Supreme Court cases or if it confronts

24   a set of facts that are materially indistinguishable from a decision of the Supreme

25   Court and nevertheless arrives at a result different from the Court's precedent.

26   <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000). "Avoiding these pitfalls does not

27   require citation of [Supreme Court] cases – indeed, it does not even require awareness

28   of [Supreme Court] cases, so long as neither the reasoning nor the result of the state

1   court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

2           **d.**      **The State Court Reasonably Rejected Petitioner's IAC Claim**

3           The Superior Court's rejection of Petitioner's claim was not contrary to, or an

4   unreasonable application of, clearly established federal law, 28 U.S.C. § 2254(d)(1),

5   or based on an unreasonable determination of the facts in light of the evidence

6   presented at the state court proceeding.  <u>Id.</u> at § 2254(d)(2).  The long-standing test

7   for determining the validity of a guilty plea is "whether the plea represents a voluntary

8   and intelligent choice among the alternative courses of action open to the defendant."[16]

9   <u>Parke v. Raley</u>, 506 U.S. 20, 29 (1992) (citation and internal quotation marks omitted).

10  This requires a review of the circumstances surrounding the plea.  <u>Brady v. United</u>

11  <u>States</u>, 397 U.S. 742, 749 (1970). Of particular importance is that the defendant enter

12  a guilty plea with sufficient awareness of the relevant circumstances and likely

13  consequences, <u>id.</u> at 748, and that he understand the law in relation to the facts.

14  <u>McCarthy v. United States</u>, 394 U.S. 459, 466 (1969). A plea is not voluntary unless

15  it is "entered by one fully aware of the direct consequences" of the plea.  <u>Brady</u>, 397

16  U.S. at 755.

17          During the plea colloquy, Petitioner was informed of the terms of the plea

18  agreement and the maximum penalty she would be facing under the agreement. (ER

19  327-328.). Petitioner acknowledged that she had discussed these matters with her

20  attorney and understood them. (<u>Id.</u> at 330.) Petitioner was further informed that certain

21  constitutional rights must be waived when entering a plea of guilty or no contest.

22  Petitioner indicated that she had discussed each right with her attorney, that she

23  understood each right, and that she gave up each right.  (<u>Id.</u> at 330-331.) Petitioner

24

25         [16]     Petitioner pled no contest to the charges against her.  Under California

26  law, a no contest plea has the same effect as a plea of guilty in the context of the

27  criminal proceedings.  <u>People v. West</u>, 3 Cal.3d 595, 601 (1970).  Accordingly,
    federal constitutional principles governing guilty pleas apply to Petitioner's claim.

28  <u>Miller v. McCarthy</u>, 607 F.2d 854, 856 (9th Cir.1979).

1  confirmed that she was pleading freely and voluntarily, that no promises or threats had
2  been made in order to get her to plead, and that she was pleading because it was in her
3  best interest to do so. (Id. at 333-334.)

4  　　　On habeas review, the Superior Court was faced with Petitioner's post-plea
5  claim that her attorney did not discuss the plea agreement with her but rather left that
6  task entirely to her grandmother.  However, this claim was directly contradicted by
7  statements made by Petitioner on the record and in open court during the plea
8  colloquy, as well as Petitioner's initialed and signed plea agreement. Sworn statements
9  in open court are presumed to be truthful, and a court should summarily dismiss
10  "conclusory allegations unsupported by specifics" or "contentions that in the face of
11  the record are wholly incredible." Blackledge v. Allison, 431 U.S. 63, 74 (1977); see
12  also United States v. Ross, 511 F.3d 1233, 1236 (9th Cir.2008) ("Statements made by
13  a defendant during a guilty plea hearing carry a strong presumption of veracity in
14  subsequent proceedings attacking the plea").

15  　　　Applying these rules, Petitioner's statements before the court and in the written
16  plea agreement must be presumed truthful.  Petitioner's assertion that counsel did not
17  explain the plea agreement or discuss Petitioner's constitutional rights with her was
18  contradicted by the rest of the record before the court, and insufficient to outweigh the
19  presumption of truth.[17] In light of the evidence presented at the state court proceeding,
20  it is clear Petitioner understood the nature and consequences of her plea and that the
21  plea was voluntary and intelligent. Thus, the Superior Court's determination that

22  _____

23  　　　[17]　　Citing pre-AEDPA cases, Petitioner contends that the allegations in her
24  habeas petition must be taken as true. (DE #57 at 10, 15.)  But even under these cases,
   "if no prima facie case for relief is stated, the court will summarily deny the petition."
25  People v. Duvall, 9 Cal.4th 464, 475 (1995). Petitioner has never alleged a critical
26  element – that, but for counsel's errors, she would not have pled guilty and would
   have insisted on going to trial instead. See Hill, 474 U.S. at 58. Thus, her allegations,
27  even if accepted as true, have never supported a prima facie case for relief based on
28  IAC.

1  Petitioner's attorney did not provide ineffective assistance of counsel during

2  Petitioner's plea was based on a reasonable determination of the facts.

3  Similarly, the court's holding was neither contrary to, nor an unreasonable

4  application of, clearly established federal law. When reviewing the validity of

5  Petitioner's plea, the court clearly followed the requirements as set out in Parke, Brady

6  and the cases cited therein. The court's ruling is also in line with the requirements of

7  Strickland and Hill, which mandate that Petitioner allege and show both that her

8  counsel provided deficient assistance and that there was a reasonable probability that,

9  but for counsel's errors, she would not have pled guilty and would have insisted on

10  going to trial. Petitioner did not include the latter allegation in her FAP and thus

11  failed to even allege a prima face case.

12  Given that the court's concomitant findings that Petitioner's attorney did not

13  provide ineffective assistance of counsel during the plea, and that the plea was

14  knowing and voluntary, satisfy the AEDPA standard of review, Petitioner's appellate

15  waiver should be enforced. See United States v. Park, 2011 WL 4047555, at *8 (N.D.

16  Cal. September 9, 2011) (enforcing appellate waiver after finding that plea agreement

17  "unequivocally stated that petitioner signed the agreement after having adequate time

18  to discuss his situation with his counsel, and that his counsel gave him all the legal

19  advice he requested"). Indeed, the waiver of a right to appeal is knowing and

20  voluntary if the plea agreement as a whole was knowing and voluntary. United States

21  v. Jeronimo, 398 F.3d 1149, 1154 (9th Cir.2005), overruled on other grounds by

22  United States v. Castillo, 496 F.3d 947, 957 (9th Cir.2007) (en banc).

23  Here, Petitioner specifically waived her right to appeal her plea as well as the

24  trial court's Miranda ruling. (ER 333.) While Petitioner did subsequently challenge

25  her plea in a state habeas proceeding, it was under the auspices of an IAC claim,

26  which allowed Petitioner to avoid her appellate waiver. However, Petitioner has *not*

27  alleged that her attorneys provided ineffective assistance of counsel when moving to

28  suppress her statements to police. This, combined with her effective waiver of her

20

right to appeal, should preclude Petitioner from challenging the trial court's determination that detectives did not violate her <u>Miranda</u> rights during their interview.[18] <u>See</u> <u>United States v. Joyce</u>, 357 F.3d 921, 922 (9th Cir. 2004) ("A defendant's waiver of his appellate rights is enforceable if the language of the waiver encompasses his right to appeal on the grounds raised, and if the waiver was knowingly and voluntarily made").

---

[18]   Petitioner attempts to shoehorn her <u>Miranda</u> claim into her already existing IAC claim, contending for the first time in her Reply that counsel provided ineffective assistance during her plea because he advised her to plead guilty instead of continuing in his attempts to get her statements suppressed. (ER #57 at 23.) Petitioner rests this claim on a slim reed, namely that her state habeas petition labeled her <u>Miranda</u> claim as: "Miranda rights violated 6 amendment right." (ER #4 at 5.) However, when citing the 6th Amendment, Petitioner was clearly referring to her right to counsel during her interview with detectives. <u>See</u> <u>id.</u> at 6 ("I wasn't even informed that I had a right to an attorney to be present during questioning. So [therefore] my Miranda rights were violated"). Furthermore, even if Petitioner *did* sufficiently state that counsel was ineffective because he advised her to plead rather than continue his suppression efforts, this claim is simply part and parcel of her "just sign here" complaint. <u>See</u> <u>id.</u> at 8 ("My attorney never explained any parts of my plea to me. Just showed me where I needed to initial and sign. The whole thing was never explained to me by a legal professional"). The Superior Court rejected that claim on the merits – a decision this Court has found was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. Lastly, while Petitioner now contends that counsel was ineffective for advising her to plead guilty rather than going to trial, which would have preserved the <u>Miranda</u> rulings for appeal, DE #57 at 21-31, this claim defies logic. To the contrary, it would have been against Petitioner's interests to go to trial, and risk a conviction and longer sentence, on the chance that an appellate court would reverse the trial court's ruling at some point in the future. Indeed, by this time, two judges had denied Petitioner's suppression motion on four different grounds. No competent attorney would have risked adding another 94 years to their client's sentence by gambling on an appellate court reversal, especially since the case cited by Petitioner in support of her claim, <u>United States v. IMM</u>, 747 F.3d 754, 764 (9th Cir. 2014), was handed down a full 7 years after her conviction. (DE #57 at 26.)

1    Nevertheless, as noted above, it is unclear if Petitioner's appellate waiver

2    prevents her from challenging the court's <u>Miranda</u> ruling in a habeas proceeding.

3    While the court did tell Petitioner she was waiving her right to appeal this particular

4    ruling, which would clearly cover a direct appeal, the court did not specify whether

5    Petitioner was also waiving her right to collaterally attack the ruling. Therefore, in an

6    abundance of caution, this Court will address the merits of this issue below.  <u>See</u>

7    <u>Lemke v. Ryan</u>, 719 F.3d 1093, 1096 (9th Cir. 2013) (reaching merits of petitioner's

8    habeas claim despite express waiver of appeal in his plea agreement because "[o]ur

9    circuit precedent makes clear ... that a waiver of collateral attack must be express, and

10   that a plain waiver of appeal does not suffice").

11           **2.      Habeas Relief is not Warranted on Petitioner's <u>Miranda</u> Claim.**

12           Petitioner re-raises a claim she litigated at least twice before the state trial court

13   – namely, that detectives violated her <u>Miranda</u> rights by failing to advise Petitioner of

14   her rights at the beginning of her interview and by failing to properly advise Petitioner

15   of her full range of rights when they did finally administer the warnings.  The Superior

16   Court rejected the claim as an improper issue for habeas review. (DE #4 at 12.) The

17   court's rejection of Petitioner's claim was not contrary to, or an unreasonable

18   application of, clearly established federal law, 28 U.S.C. § 2254(d)(1), or based on an

19   unreasonable determination of the facts in light of the evidence presented at the state

20   court proceeding.  <u>Id.</u> at § 2254(d)(2).

21           "[A] guilty plea represents a break in the chain of events which has preceded

22   it in the criminal process. When a criminal defendant has solemnly admitted in open

23   court that he is in fact guilty of the offense with which he is charged, he may not

24   thereafter raise independent claims relating to the deprivation of constitutional rights

25   that occurred prior to the entry of the guilty plea."  <u>Tollett v. Henderson</u>, 411 U.S.

26   258, 267 (1973).  He may only attack the voluntary and intelligent character of the

27   guilty plea by showing that the advice he received from counsel "was not within the

28   within the range of competence demanded of attorneys in criminal cases."  <u>Id.</u> at 266-

57 (citing <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970)).  <u>See also</u> <u>Mabry v. Johnson</u>, 467 U.S. 504, 508-09 (1984) ("[A] voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked ... It is only when the consensual character of the plea is called into question that the validity of a guilty plea may be impaired").

Thus, we have come full circle. In order to render her <u>Miranda</u> claim cognizable on habeas review, Petitioner must challenge her guilty plea by showing she received ineffective assistance of counsel.  However, as discussed above, the Superior Court's findings that Petitioner's attorney did not provide ineffective assistance of counsel during Petitioner's guilty plea, and that her plea was therefore knowing and voluntary, satisfy the AEDPA standard of review.  Thus, even if Petitioner's appellate wavier does not apply in a habeas proceeding, Petitioner is still precluded from rasing her <u>Miranda</u> claim here.  In short, because the Superior Court's finding that counsel was not ineffective survives AEDPA review, so must the court's finding that Petitioner's <u>Miranda</u> claim was an improper issue for habeas review.[19]

---

[19]    As noted above, Petitioner now contends that she received ineffective assistance of counsel during her plea because her attorney advised her to plead instead of continuing in his efforts to get her statements suppressed. Petitioner specifically faults counsel for failing to re-raise at the second suppression hearing the same arguments raised at the first hearing. (DE #57 at 30.)  Counsel could have again argued that Petitioner was in custody at the start of the interview, thus triggering the need for <u>Miranda</u> warnings at the outset. However, the first hearing, which involved three witnesses and generated a nearly 90-page record, reasonably demonstrated that Petitioner was not considered a suspect when the interview began and was told she could leave at any time. Thus, the second judge, like the first, likely would have found that the interview was not custodial in nature initially, especially since the judge found no coercive tactics were used to get Petitioner to talk. (ER 327.)  Counsel could have again argued that the warnings eventually administered were defective. But Petitioner had already made sufficiently damaging admissions by that point.  (ER 157-158.) Thus, suppressing Petitioner's post-<u>Miranda</u> statements would not have appreciably

(continued...)

## C.   Petitioner's Request for an Evidentiary Hearing is Denied

Petitioner seeks an evidentiary hearing on her IAC claim. (DE #57 at 9-11.) Federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398.  The record before the state court in this case shows that Petitioner did not, and to date has not, claimed that but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial.[20]  Thus, even if the allegations of Petitioner's habeas petition were taken as true to test their legal sufficiency, Petitioner's claim is still missing an essential element and she has not pleaded a prima

---

[19](...continued)
weakened the prosecution's case. Rather than place Petitioner in the exact same position she was in after the first hearing, counsel tried another tactic, positing different arguments that could have led to the suppression of her entire statement. That counsel was unsuccessful does not make him ineffective. See Strickland, 466 U.S. at 689-90. Lastly, while counsel could have cast doubt on the reliability of Petitioner's statements had the case gone to trial, see Crane v. Kentucky, 476 U.S. 683, 687-91 (1986), her plea deal would have been long gone.

[20]    Petitioner admits she did not expressly make this claim in her federal petition, but maintains that she made it implicitly. (DE#57 at 18.) Petitioner says her allegation about the prior rejected deal, coupled with her subsequent allegations that she only accepted an "arguably worse" deal after her grandmother explained the plea agreement to her, includes an implicit allegation that she would not have accepted that agreement had it been properly explained to her. (Id. at 18-19.) This argument is unavailing. First, Petitioner's claim that her attorney had Petitioner's grandmother explain the plea agreement is belied by the record. (ER 328.) Furthermore, the Court notes that record numbers of life-term inmates now receive parole. See ww2.kqed.org/news/behind-californias-dramatic-increase-in-lifers-freed-from-prison (last visited Sept. 30, 2015). Thus, it is unclear whether Petitioner's 16 years to life indeterminate sentence is appreciably worse than the 18½ year determinate sentence she was first offered – especially given that, according to Petitioner, she faced 110 years to life had she gone to trial. While Petitioner's allegations may call into question whether her first attorney provided ineffective assistance of counsel when Petitioner rejected the *initial* offer, that is a claim Petitioner does *not* make.

facie case for relief. Thus, an evidentiary hearing is not warranted here. <u>Hill</u>, 474 U.S. at 60 (affirming district court's denial without an evidentiary hearing of federal habeas petition because Petitioner did not allege that, but for counsel's incorrect advice as to amount of time he would serve, Petitioner would not have pled guilty but would have instead insisted on going to trial, and thus did not satisfy "prejudice" requirement for IAC claim).

Furthermore, "a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1166–67 (9th Cir.2005). This Court has already determined that the state court's decision reflected a reasonable determination of the facts. Thus, the Court may not grant an evidentiary hearing here. <u>Rich v. Calderon</u>, 187 F.3d 1064, 1067-68 (9th Cir. 1999) ("An evidentiary hearing on a claim is required where it is clear from the petition that: (1) the allegations, if established, would entitle the petitioner to relief; and (2) the state court trier of fact has not reliably found the relevant facts. Nothing in [petitioner's] submissions below suggests he could meet either requirement").

Although Petitioner contends this Court incorrectly treats the plea record as creating an irrebuttable presumption of veracity, DE #62 at 9, federal courts regularly rely on this record when determining whether to grant an evidentiary hearing. <u>See, e.g.</u>, <u>Zepeda v. Figueroa</u>, 2014 WL 2605360, *15-18 (S.D. Cal. June 11, 2014) (hearing not necessary because plea agreement and colloquy transcript demonstrated petitioner understood nature of the charges and significance of his plea); <u>Moore v. Chrones</u>, 607 F.Supp.2d 1005, 1048 n.39 (C.D. Cal. 2010) ("To the extent [petitioner] might contend that his … plea was not voluntary, knowing, and intelligent ... the record of his plea hearing precludes any such contention"); <u>Loftis v. Almager</u>, 2009 WL 2151372, *8 (E.D. Cal. July 17, 2009) (petitioner's conclusory allegation that he failed to understand charges or penalty deemed insufficient to overcome statements he made in open court at the plea hearing and the factual findings of the trial court).

**RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: December 23, 2015

_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

26